People v Clifford (2024 NY Slip Op 24027)

[*1]

People v Clifford

2024 NY Slip Op 24027

Decided on January 30, 2024

Supreme Court, New York County

Lantry, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on January 30, 2024
Supreme Court, New York County

The People of the State of New York,

against
Jasmine Clifford, NADAYZA BARKLEY, R.V., and J.O., Defendants.

IND-70718-21

Prosecutor: 
Alvin L. Bragg, Jr., District Attorney of New York County
Taylor Holland, Assistant District Attorney and Catherine McCaw, Assistant District Attorney 
One Hogan Place
New York, NY 10013
(212) 335-9000 
Defense Counsel for Jasmine Clifford
Nicholas Dayan, Esq.
80-02 Kew Gardens Rd, Suite 902
New York, NY 11415
718-268-9400
Defense Counsel for Nadayza Barkley
Glenn F. Hardy, Esq.
1619 3rd Ave., Ste. 9K
New York, NY 10128
(516) 248-4041
Defense Counsel for R.V.
Law Offices of Harlan Greenberg, P.C.
Harlan Greenberg, Esq.
20 Vesey Street, Suite 400
New York, NY 10007
(212) 964-0503
Defense Counsel for J.O.
Grizopoulos & Portz, P.C.
Gregory Grizopoulos, Esq. 170 Old Country Road, Suite 502
Mineola, New York 11501
(516) 492-8220

Brendan T. Lantry, J.

Defendants Jasmine Clifford ("Clifford"), Nadayza Barkley ("Barkley"), R.V. ("R.V."), and J.O. ("J.O.") (hereinafter, collectively, the "Defendants"), by and through their attorneys, hereby move this Court for an Order (1) dismissing the accusatory instrument in the interest and furtherance of justice pursuant to CPL §210.40 and 170.40 and People v. Clayton, 41 AD2d 204 [2d Dept., 1973] and (2) for such other and further relief as this Court may deem just, proper and equitable under the circumstances.[FN1]

In response to the Defendants' motions, the People filed an Affirmation in Response in which they collectively respond to each of the Defendant's motions. Defendant R.V. filed a Reply Affirmation and the remaining Defendants did not file same. Following the Court's extensive oral arguments held on November 30, 2023, the People submitted to the Court a letter with exhibits as well as a copy of the grand jury transcript on December 14, 2023. 
Based upon the evidence and papers submitted by the parties, the Court hereby grants the motions submitted by Defendants R.V. and J.O. and denies the motions submitted by Defendants Clifford and Barkley, as set forth below.
 Factual Allegations and Procedural History
This matter arises out of the falsification of COVID-19 vaccine cards and the purchase of same. Clifford is alleged to have profited tens of thousands of dollars through her sale of several hundred falsified COVID-19 vaccine cards to various buyers throughout the country. The People allege that in furtherance of this scheme, Clifford worked with Barkley to enter false information into the New York State Immunization Information System ("NYSIIS") database while using the account of a medical clinic in Patchogue, New York where Barkley worked. 
The Office of the New York Country District Attorney, led by current District Attorney Alvin Bragg (hereinafter the "People"), investigated and found hundreds of individuals from various parts of the country who purchased illegitimate COVID-19 vaccination cards. From over two hundred individuals who allegedly purchased the falsified COVID-19 vaccination [*2]cards, the People cherry-picked [FN2]
sixteen (16) of them for felony prosecution.[FN3]
Fourteen (14) of the buyers pled guilty to misdemeanor Criminal Possession of a Forged Instrument in the Third Degree (Penal Law § 170.20), an A misdemeanor, as a lesser included of the sole count of the indictment against those individuals, Criminal Possession of a Forged Instrument in the Second Degree (Penal Law § 170.25), a D felony. J.O. and R.V. are the last two remaining defendants who the People allege purchased fake COVID-19 vaccine cards from Clifford.

Discussion
As stated above, the Defendants currently move to dismiss this matter under CPL §210.40 in the interests of justice. Pursuant to the terms of CPL §210.40, the Court may grant a Defendant's motion to dismiss an indictment in the furtherance of justice. Specifically, CPL §210.40(1) provides:
An indictment or any count thereof may be dismissed in furtherance of justice, as provided in paragraph of (i) of subdivision one of section 210.20, when, even though there may be no basis for dismissal as a matter of law upon any ground specified in paragraphs (a) through (h) of said subdivision one of section 210.20, such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment or count would constitute or result in injustice.
CPL §210.40(1) further provides that when determining whether such compelling factor, consideration, or circumstance exists, the Court "must, to the extent applicable, examine and consider, individually and collectively" the following factors:
(a) the seriousness and circumstances of the offense;
(b) the extent of harm caused by the offense;
(c) the evidence of guilt, whether admissible or inadmissible at trial;
(d) the history, character and condition of the defendant;
(e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;
(f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
(g) the impact of a dismissal upon the confidence of the public in the criminal justice system;
(h) the impact of a dismissal on the safety or welfare of the community;
(i) where the court deems it appropriate, the attitude of the complainant or victim with [*3]respect to the motion;
(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose. CPL §210.40(1).
The Appellate Division, First Department has held that while dismissal pursuant to CPL §210.40(1) is committed to the trial court's discretion, such power to dismiss "is not absolute" and "it should be 'exercised sparingly' and only in that 'rare' and 'unusual' case where 'it cried out for fundamental justice beyond the confines of conventional considerations.'" People v. Harmon, 181 AD2d 34, 36 [1st Dept 1992]. See People v. Williams, 145 AD3d 100, 107-08 [1st Dept 2016] (quoting People v. Harmon); People v. Hadnott, 74 Misc 3d 509, 510-11 [Sup Ct 2022]. 
In People v. Williams, the First Department noted that:
When reviewing the circumstances in a case such as this, it is the public interests that must be largely considered (see People v. Andrew, 78 AD2d 683 [2nd Dept 1980]). An exemplary background, employment status, or lack of prior contact with the criminal justice system are insufficient to justify dismissal of the criminal charges against a defendant (see People v. Kelley, 141 AD2d 764, 765 [2nd Dept 1988]). Nor are an individual's business success or respectable standing in the community sufficient to warrant a finding of dismissal in the interests of justice (see People v. Madsen, 11 Misc 3d 1067 [A] [Crim Ct, Kings County 2006, Sciarrino J]).
Regarding the factors to be weighed in evaluating whether there exists a compelling basis for dismissal, such an analysis provides a means of limiting the discretion of the trial courts while guaranteeing a standard for appellate review (People v. Belge, 41 NY2d 60, 62 [1976] ). It is significant to note, however, that while a court need not engage in a discussion of or explicitly address every factor, it must consider the "real and compelling" reasons to warrant dismissal (People v. Rickert, 58 NY2d 122, 128 [1983]). Indeed, whether assessed individually or collectively, a court must be convinced they present a compelling circumstance so as to constitute the "'rare' and unusual' " case that warrants dismissal in the interest of justice (People v. Harmon, 181 AD2d 34, 36 [1st Dept 1992]; People v. Reyes, 174 AD2d 87, 89 [1st Dept 1992]; People v. Insignares, 109 AD2d 221, 234 [1st Dept], lv denied 65 NY2d 928 [1985]; Clayton, 41 AD2d at 208. People v. Williams, 42 Misc 3d 1237(A) [Sup Ct 2014]
The Court finds that considering the factors set forth under CPL §210.40, the instant case against Defendants J.O. and R.V. constitutes that "rare and unusual case" that cries out for fundamental justice beyond the confines of conventional considerations and, therefore, dismissal is warranted. However, the Court does not make such a finding as to Defendants Clifford and Barkley, as the factors set forth in CPL §210.40 weigh against dismissal. 
The People submit that the motions are untimely pursuant to CPL § 255.20 and People v. Figueroa, 203 AD2d 72 [1st Dept. 1994], which provides that a motion to dismiss in the interest of justice must be made within 45 days after an arraignment. However, the express terms of CPL § 255.20 provides that said motion must be made "within forty-five days after an arraignment . . . or within such additional time as the court may fix upon application of the defendant made prior to entry of judgment." As this Court previously granted the application of each of the defendants for leave to file the instant motions, the motions are not untimely.
However, this Court is astonished to see the People make such an argument when the People routinely — nearly daily — move to dismiss significantly more serious counts or entire [*4]indictments in the interests of justice simply to negate the consequences of New York's predicate felon sentencing statutes or to avoid immigration consequences. These motions submitted by the People are made months or even years after the 45-day period has expired to dismiss counts of indictments such as sexual assaults, drug sales, robbery, burglary, and other violent and non-violent serious felony offenses. To say now that such a motion is untimely is wholly inconsistent with the practice of the Office of the New York District Attorney.
The Court will now address the relevant factors.

Factor 1 — The Serious and Circumstances of the Offense
In their motion papers, several of the Defendants have submitted numerous facts and assertions about the COVID-19 pandemic, the efficacy of vaccines in general, and policy objections to vaccine mandate policies. While many of the arguments are compelling, the issue of the legality of vaccine mandates in New York State has been extensively litigated and has resulted in the Appellate Division upholding the legality of the mandates imposed by former Governor Andrew Cuomo and former Mayor Bill de Blasio. See Parks v Commr. of Labor, 219 AD3d 1099, 1101 [3d Dept 2023] ("Contrary to claimant's contention that the vaccine mandate violates his First Amendment religious and other constitutional rights, religious beliefs do not excuse compliance with a valid, religion-neutral law of general applicability that prohibits conduct that the state is free to regulate, as the Board recognized."); O'Reilly v Bd. of Educ. of City School Dist. of City of New York, 213 AD3d 560, 568 [1st Dept 2023] ("Because petitioners were given the opportunity to submit proof of vaccination, request religious or medical exemptions and accommodations if immunocompromised, or opt for extended benefits and severance on more favorable terms, their due process rights were not violated."); Marsteller v City of New York, 217 AD3d 543, 545 [1st Dept 2023] ("Petitioner has also not established that the City's process for resolving requests for accommodations to the vaccine mandate fell short of the requirements of the New York City Human Rights Law.")
In their opposition to the motion, the People address this Factor in conjunction with Factor 2, The Extent of Harm Caused by the Offense, discussed infra. Specifically, the People argue that in mid-2021, when the Defendants are alleged to have committed the crimes contained within the indictment, "New York City was still reeling from the effects of a global pandemic" and "vaccines were widely viewed as the key to persuading a reluctant public to rejoin society and move past the pandemic." The People argue that Clifford and Barkley "worked together to impair the integrity of the NYSIIS database, requiring extensive DOH resources to be invested to attempt to restore the integrity of the database." As to J.O. and R.V., the People argue that they "set out to deceive their employers regarding their vaccination status, potentially subjecting their coworkers to risk." The People further assert that "[b]y only pretending to be vaccinated, at a time when vaccination was required so that workplaces could relax masking, social distancing, and other safety precautions, the defendants exposed others around them to elevated COVID risks."[FN4]

This Court agrees with the People that falsifying a state healthcare database is a serious offense that favors denial of the motion by Clifford and Barkley. While counsel for Clifford avers that "Defendant [Clifford] began selling COVID Vaccination cards by simply printing them on regular paper and providing them to people that expressed genuine concern for the vaccine," that's certainly not where it ended — nor did Clifford merely "provide" cards to scared citizens concerned with an infringement upon their freedom. Clifford, with assistance from Barkley, is alleged to have profited on the backs of otherwise law-abiding citizens who were afraid of losing their jobs and other benefits if they did not comply with the edicts from our City's then-mayor and State's then-governor.
Conversely, evaluating the seriousness of the allegations against J.O. and R.V. favors granting the motions by those defendants.
J.O., a thirty-five (35) year old nursing student who struggled with conception, allegedly purchased the falsified COVID-19 card in June 2021. One month later, J.O. received a double dose of the Pfizer COVID-19 vaccine at CVS on July 28, 2021 and August 27, 2021. J.O. took the COVID-19 vaccine approximately one month prior to returning to nursing school, where compliance with their vaccine mandate was required. The Court notes that the People do not allege that J.O. provided the vaccine card to any individual or entity with intent to defraud same. Furthermore, the People do not allege that J.O., in fact, presented the fake COVID-19 card to any individual or entity whatsoever. Nevertheless, the People indicted J.O. for felony Criminal Possession of a Forged Instrument on August 31, 2021. 
R.V. was previously convicted of a felony stemming from a 2006 federal narcotics conspiracy charge when he was nineteen (19) years old. R.V. has, by all accounts, turned his life around following his federal conviction. Following his release from incarceration, R.V. enrolled in Queensboro Community College, became a licensed Electrician Helper, and joined the International Brotherhood of Electrician Workers (IBEW) Local #3. Indeed, in 2019, R.V. was hired as a Permanent Electrician's Helper with the New York City Department of Environmental Protection (DEP), where he served as an essential frontline worker during the worst initial days of the COVID-19 pandemic. R.V.'s counsel argues that a conviction in this matter will torpedo R.V.'s aspirations to gain a Special Electrician's License or Master License and that a conviction puts R.V. at risk of losing his current position. 
Simply stated, it is apparent that J.O. and R.V. purchased the purportedly fake COVID-19 card in order to maintain enrollment in nursing school (J.O.) and employment at DEP (R.V.) while each maintaining an aversion to receiving the novel COVID-19 vaccine. Though, as stated supra, J.O. ultimately overcame her aversion to the vaccine in receiving a double dose of the vaccine before school commenced and before the indictment.
While counsel for R.V. avers in evaluating this factor that "[t]he policies instituted were by politicians who were attempting to make it appear to the public that they were taking action in the battle against Covid," this Court takes no position as to this argument. Instead, this Court turns its attention to the seriousness of the crimes alleged and R.V.'s and J.O.'s individual circumstances in allegedly purchasing fake COVID-19 vaccine cards. In requiring an evaluation of the "seriousness" of the offense, the legislature's mandate naturally requires a comparison of [*5]seriousness of the subject statute to other provisions of the Penal Law.
Clearly, Criminal Possession of a Forged Instrument in the Second Degree (Penal Law § 170.25) is not among the most serious crimes in the New York Penal Law, nor are the factual allegations against Defendants R.V. and J.O. particularly serious in nature. Moreover, the factual allegations — that the Defendants purchased fake COVID-19 vaccination cards so that they could provide same to their employer (R.V.) and school (J.O.) — do not rise to the level of the majority of the crimes adjudicated in Supreme Court, New York County, namely homicide, sexual assault, drug sale, robbery, burglary, and other violent and non-violent serious felony offenses. As discussed, supra, the People routinely — nearly daily — move to dismiss significantly more serious counts or entire indictments in the interests of justice simply to negate the consequences of New York's predicate felon sentencing statutes or to avoid immigration consequences. 
Based on the foregoing, the Court finds that Factor 1 weighs against dismissal of the indictment against Clifford and Barkley, but weighs in favor of dismissal of the indictment against J.O. and R.V.

Factor 2 — The Extent of Harm Caused by the Offense
The Court will consider any specific harm caused by each of the Defendants, as well as any overall societal harm caused by the actions that the Defendants are alleged to have perpetrated.
Specific Harm
Counsel for Barkley thoughtfully argues the following:
During the timeframe of Ms. Barkley's acts, the New York State and City government believed COVID was waning. On June 15, 2021, [former] Governor Cuomo reopened New York state and on July 1, 2021, [former] Mayor de Blasio opened New York City, even holding a ticker tape parade for its "Hometown Heroes" on July 7, 2021. This is all in the midst of the allegations against Ms. Barkley. The government was at pains to set a standard as a multitude of confusing and often contradictory rules and regulations were put in place not only in New York, but across the country. On February 3, 2021, the CDC director announced it was not necessary for teachers to be vaccinated in order to reopen schools only to reverse course weeks later. On April 14, 2021, the U.S. Government paused the use of the Johnson & Johnson vaccine, again only to reverse course two weeks later. These are just two examples of the ever-changing procedures regarding COVID.
Counsel for Clifford, declining to delineate arguments as to each factor, argues in sum and substance, that Clifford's sales were altruistic and in response to a strong demand from individuals fearful of the vaccine.
Despite Counsel's arguments to the contrary, the extent of harm caused by Clifford and Barkley is apparent. As noted by the People, the manipulation of the database by Clifford and Barkley "require[ed] extensive DOH resources to be invested to attempt to restore the integrity of the database." 
As to R.V. and J.O., there are no allegations that either one of these Defendants caused [*6]any specific harm other than any broad societal harm that the People aver a person causes, or caused, in going out into society unvaccinated. The People argue simply that they "set out to deceive their employers regarding their vaccination status, potentially subjecting their coworkers to risk." 
R.V., working as an electrician's helper for the DEP, presumably has very little interaction with the public at large. This contravenes the People's argument that his actions had any effect on policies pertaining to required "masking" and "social distancing."
In following the People's own argument regarding the importance of COVID-19 vaccination, J.O. certainly did not affect any colleagues, classmates or faculty as shown by the fact that she was actually vaccinated, despite the alleged purchase from defendant Clifford.
Societal Harm
The most updated data from the New York City Department of Health and Mental Hygiene is current as of September 23, 2023 (this outdated data, coupled with its termination of COVID-19 vaccination mandates for city employees on February 6, 2023 shows, perhaps, how seriously the City of New York currently takes the COVID-19 disease). As of September 23, 2023, 761,498 New York City residents (or 9.1%) have never received a single dose of the vaccine and 1,565,284 New York City residents (or 18.7%) did not complete the primary vaccine series. (See COVID-19: Data on Vaccines — NYC Health — 
https://www.nyc.gov/site/doh/covid/covid-19-data-vaccines.page#people).
The societal harm of failure to abide by (or implement) vaccine mandates have been heavily debated. Clearly, as noted by the People, it is the policy of the New York State legislature that vaccine mandates should have been implemented and enforced. However, other states — such as the State of Florida — refrained from imposing a vaccine mandate. Despite the lack of a mandate, data from the Center for Disease Control and Prevention, current through December 28, 2023, shows that there have been 319.4 COVID-19 deaths for every 100K New Yorkers while there have been 253.5 COVID-19 deaths for every 100K Floridians. (See CDC COVID Data Tracker: Maps by Geographic Area- https://covid.cdc.gov/covid-data-tracker/#maps_deaths-total). 
As stated, supra, this Court declines to rule on the efficacy of vaccines, in general, or provide a ruling as to the propriety of overall vaccine mandate policies. This Court cites the data from the New York City Department of Health and Hygiene and the Center for Disease Control and Prevention to arrive at the following conclusion: the People have not submitted arguments sufficient to establish that J.O. and R.V. caused any harm — specific or societal — in purportedly purchasing a fake COVID-19 card and failing to be vaccinated, whether or not they returned to work unvaccinated (R.V.) or to school vaccinated (J.O.).
This factor weighs in favor of dismissal of the indictment against J.O. and R.V. and against dismissal of the indictment against Clifford and Barkley.
Factor 3 — The Evidence of Guilt, Whether Admissible or Inadmissible at Trial
As hereinafter discussed, this factor weighs in favor of dismissal against J.O. and against dismissal against Clifford, Barkley and R.V.
R.V. argues in his moving papers that despite email correspondence between himself and Clifford pertaining to an alleged purchase of COVID-19 vaccine cards, there is no proof that he [*7]ever actually possessed a fake COVID-19 card, nor was any card provided to his employer, DEP. However, following oral argument, the People provided a copy of a purportedly fake COVID-19 card that R.V. provided to his employer. Based upon such record, this factor weighs against dismissal of the indictment against R.V.
Clifford provides no specific arguments in support of dismissal based upon this factor except to state that the "conduct that has led her to this courtroom [was] not driven by criminal mindedness, nor by greed, but by genuine concern over the vaccine, its potential side effects on herself and children, and as more people came to her for help, she began to expand in what she believed was a righteous endeavor to help people." No further arguments or documentary evidence negating the indictment have been provided. This factor weighs against dismissal of the indictment against Clifford.
Barkley does not submit significant argument as to this factor, only to state that "[t]he People claim there is significant evidence of guilt in this matter. There are electronic trails that appear to be connected to Ms. Barkley." In Exhibit B to their correspondence dated December 14, 2023, the People have provided extensive records that appear to show that Barkley entered false information in to the NYSIIS database. Based upon such submission, this factor weighs against dismissal of the indictment against Barkley.
J.O. argues that there is "little to no evidence of guilt" as "[n]o forged COVID-19 Vaccination Card was ever filed with LI University nor the nursing program nor any hospital in which she worked or trained. At best, when some type of card was mailed to [J.O.] in June of 2021, she did not have the intent to use it since, for over a month, it was never used or filed." As stated, supra, J.O. received a double dose of the Pfizer COVID-19 vaccine at CVS on July 28, 2021 and August 27, 2021. There is no allegation by the People that J.O. provided the vaccine card to any individual or entity with intent to defraud same — or that it was provided to any individual or entity whatsoever. Nevertheless, the People indicted J.O. for felony Criminal Possession of a Forged Instrument on August 31, 2021.
The People argue that "the evidence is just as compelling against J.O.," reasoning that J.O. admitted in the grand jury that she purchased a falsified COVID-19 vaccination card and that she engaged in a colloquy with Clifford wherein J.O. asked for "additional information about her risk of getting caught . . . her inquiry into obtaining a second card with a more convincing vaccination site, and her decision to contact Clifford yet again to ask how much it [costs] to take the additional step of adding her false information to the NYSIIS database." The People conclude that "notwithstanding J.O.'s claims to the contrary, the evidence was resounding that J.O. possessed a falsified COVID-19 vaccination card and that she intended to use that card to defraud her school and any hospitals to which she might be sent for clinical rotations."
Criminal Possession of a Forged Instrument in the Second Degree (Penal Law § 170.25) provides, in relevant part, that "[a] person is guilty of criminal possession of a forged instrument in the second degree when, with knowledge that it is forged and with intent to defraud, deceive or injure another, he utters or possesses any forged instrument . . .." Penal Law § 170.25 (emphasis added). As held by the Appellate Division, First Department, "While a defendant's intent must be specific to the crime, the specific intent required for possession of a forged instrument is a state of mind that may 'be inferred from the act itself ... [or] from the defendant's conduct and the surrounding circumstances.'" People v. Rodriguez, 71 AD3d 450, 452 [1st Dept 2010], affd, 17 NY3d 486 [2011] (internal citations omitted).
Here, J.O.'s conduct and surrounding circumstances — namely that she took the vaccine [*8]and she did not provide the purportedly fake COVID-19 card to her school or any employer — cause this factor to weigh in favor of dismissal of the indictment against J.O.
Factor 4 — The History, Character and Condition of the Defendant
As hereinafter discussed, this factor weighs in favor of dismissal against J.O. and Barkley and against dismissal against Clifford and R.V.
R.V.'s and J.O.'s arguments as to their history, character and condition are included, supra, within Factor 1. In sum and substance, while J.O. has no prior criminal history, R.V. was sentenced on May 30, 2006 to 120 months in prison stemming from a federal narcotics conspiracy charge when he was nineteen (19) years old. Since his release, R.V. has, by all accounts, turned his life around — he has not had any other contact with the criminal justice system and he has secured long-term employment at NYC DEP. 
Clifford argues that she is a "single mother of two, and for her entire life she has devoted herself to taking care of her children," that she "did not trust to take the vaccine or to have her young children, aged 5 and 11" take the vaccine, and that she founded Mothers Love Organics LLC in 2019 illustrating that she "supports organic foods for her children and is somewhat of a health fanatic."
Barkley has no prior criminal history. Following this indictment, Barkley was fired from her position at North Ocean Medical Group, and she subsequently began a catering business while saving for her own food truck. Barkley argues that her mother passed away in July 2021, which "added additional stress to her life."
Without arguing the weight to which the Court should attribute this factor in favor or against dismissal as to each defendant, the People note that Clifford is a "predicate offender who committed the instant offense while on probation." Further, the People argue that while Clifford chose to characterize her prior offense as a "simple case of driving with a suspended license," her own motion indicates she owed more than $30,000 to the DMV" and that she "earned tens of thousands of dollars from her instant crimes."
The People note that Barkley and J.O. do not have a criminal history, but that this fact alone does not justify dismissal in the interest of justice. The People submit that Barkley's submission that she has maintained steady employment and "has apparently started a catering business during the pendency of the case, dismissal of the indictment on that basis would essentially reward the defendant for doing what most Americans do every single day."
As to R.V., the People argue that the Court should essentially treat the defendant as a predicate, even though he is not a predicate. Specifically, the People submit that "[a]lthough R.V. technically is not a predicate offender within the meaning of the law, his repeated criminal acts plainly weigh against dismissal."
The People submit that the Court should not consider maintaining employment, starting a business, and "reward[ing a] defendant for doing what most Americans do every single day." However, these are essentially the same arguments that this Court receives routinely from the People in matters in which the People want the Court to accept certain pleas submitted to the Court for consideration.[FN5]

Accordingly, this factor weighs in favor of dismissal against J.O. and Barkley and against dismissal against Clifford and R.V.
Factor 5 — Any Exceptionally Serious Misconduct of Law Enforcement Personnel in the Investigation, Arrest and Prosecution
Notwithstanding J.O.'s submission that the District Attorney has engaged in "selective prosecution" based on occupation, there is no allegation of exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendants in this matter, as this factor intended to be evaluated by the legislature. Accordingly, this factor weighs against dismissal.
Factor 6 — The Purpose and Effect of Imposing a Sentence Authorized for the Offense
R.V. submits that while "[t]he purpose of imposing a sentence is to punish a defendant and to deter future criminal conduct of the defendant and others in the community," a conviction would be devastating to his career and his family and that "imposition of a jail sentence would end his career and potentially set him off on a negative trajectory." 
While Counsel for Clifford does not specifically address Factor 6, counsel submits that "in the interest of justice, [Clifford's] criminal charges should be dismissed because her crimes were born out of genuine concern for her health, and the health of others."
Barkley submits that the People's recommended sentence of probation is unnecessary because Barkley "needs no such supervision." Barkley further submits that adding probation on top of her new catering business "would be an unnecessary drain on the Department of Probation's limited resources and simply a burden on a woman who understands the severity of her actions and yet is moving forward with her life in a productive manner."
J.O. submits that the Court should impose a "minimally sufficient sentence" to achieve the purposes of punishment-justice, deterrence, incapacitation, and rehabilitation."
As to Clifford, the People note that they are recommending 2 to 4 years, the minimum sentence permissible as to the top count of the indictment due to Clifford's predicate felony status. In support, the People submit that a term of incarceration would punish Clifford for her criminal scheme and "discourage others from attempting similar crimes." Moreover, the People state that "[i]mposition of the legislature's intended sentence on [Clifford] would further New York State's police interest in ensuring the integrity of governmental records and databases and would punish a blatant criminal scheme done for profit."
As to Barkley, the People recommend probation, which the People note is the same sentence requested by the Mitigation Works report submitted by Barkley. The People submit that probation will deter Barkley from engaging in further crimes and ensures that "if she commits any new crimes[,] they can be appropriately addressed."
As to R.V., the People recommend probation. In response to R.V.'s argument that a felony sentence would "potentially lead to a loss of his current position, result in a demotion or losing his job entirely," the People argue that (1) a second felony is minimal due to R.V.'s prior federal felony conviction; and (2) R.V.'s concern for his employment is belated because he "engaged in a scheme to mislead this very same employer, potentially endangering his colleagues."
As to J.O., the People recommend probation. Following J.O.'s rejection of a misdemeanor offer, the People argue that a criminal conviction is a necessary sanction "given [*9]the nature of her conduct, and her less than candid testimony before the grand jury."
As to J.O. and R.V., this Court finds that there is no purpose and effect of imposing any sentence authorized for the offense of allegedly purchasing a fake COVID-19 card based upon the evaluation of the various other factors discussed in this Decision. 
As to Barkley, this Court agrees with the parties that a non-incarceratory sentence is appropriate.
As to Clifford, the Court finds the recommendation of 2 to 4 years of incarceration to be wholly inconsistent with the plea offers submitted to this Court by District Attorney Bragg's office within the past year. Indeed, it is common practice for this District Attorney's office to offer a plea to a lesser included charge of an indictment to avoid the "legislature's intended sentence" and/or to avoid immigration consequences of a plea. For the People to now rely on People v. Reyes, 174 A.D2d 87 (1st Dept. 1992) for the position that "confidence in the criminal justice system 'can only be undermined when justice is administered in less than an even-handed fashion'" is quite simply, ludicrous. Notwithstanding the People's contradictory position in this case, the People have the right to make any lawful plea or recommendation, and the legislature's mandate enjoins this Court from making an offer less than the statutory minimum, which the defense has conceded is 2 to 4 years of incarceration.
Factor 7 — The Impact of a Dismissal Upon the Confidence of the Public in the Criminal Justice System
Citing People v. Curtis, 784 N.Y.S2d 922 [Criminal Court, Bronx County, 2003], Barkley submits that the harm caused by Barkley's act "was de minimis and fundamental justice requires that this defendant be released from further prosecution due to her singular lapse in judgment and unique personal circumstances. Public confidence in the criminal justice system will be strengthened by the court's recognition that honest people occasionally err, and defendant's contrition suggests that imposing punishment would not serve any purpose."
Barkley further submits Justice Ronald Castorina, Jr.'s decision in People v. McAlarney, 154 N.Y.S.3d 410 (Criminal Court, Richmond County, 2021), specifically that "rather than undermining the public's confidence in the criminal justice system, a dismissal is more likely to bolster it; as it reminds the public that judges do not function like machines, fixing sentences according to some inflexible statutory algorithm, but rather are cognizant of, and governed by, countless human variables that determine the justness or unjustness of imposing a given sentence."
While the caselaw cited by Barkley is persuasive and on point, the factual allegations pertaining to Barkley regarding this factor weigh against dismissal. As noted, supra, the harm caused by Barkley was not "de minimis," as submitted by counsel for Barkley. The manipulation of the database by Clifford and Barkley "require[ed] extensive DOH resources to be invested to attempt to restore the integrity of the database." Accordingly, this factor weighs against dismissal of the charges against Barkley and Clifford.
J.O. submits that "[g]iven the quantum of knowledge we have as a society now about COVID-19 and about the COVID vaccinations and the clear politicizing of the vaccine, mandates, regulations and impositions on an individual personal choice, the public should be pleased with a dismissal of Ms. 
[O.]'s charges, especially if they knew the details and circumstances as they relate to her conduct." In addition, J.O. submits that, early in the pandemic, the U.S. Surgeon General advised the American people to "stop buying masks" and [*10]that "they are not effective in preventing the spread of the coronavirus."
Arguing that there have been "conflicting opinions" on the safety of the vaccines, counsel for J.O. submits that "those pregnant or looking to get pregnant, there was little to no data to support that the vaccine was safe and wouldn't cause long term complications or infertility."
Additionally, J.O. argues that "[c]ity employees who were terminated for failing to become vaccinated are now years later being reinstated and rehired after lengthy court battles."
J.O. submits that "[a] dismissal on this limited case would help bolster the public's confidence in the Criminal Justice system as it related to these charges and these facts, that the system worked and that after careful consideration the Court properly dismissed these charges in the interest of justice."
The People take issue with J.O.'s submission that dismissal will "give the public confidence." The People submit that "if the Court were to dismiss the indictment with respect to these defendants, the other twelve defendants who have already pleaded guilty might reasonably feel that they were unfairly penalized for promptly accepting responsibility for their actions."
This argument fails. An injustice is an injustice — no matter when during an action a motion is made to cure that injustice. Contrary to the People's submission, infra, that a motion to dismiss in the interest of justice may be made only within 45 day time period specified in CPL § 255.20(20), no such time restraint applies to motions made pursuant to CPL § 210.40. 
As to People's submission that the "general public would be left to wonder whether justice was equally served, especially given that these four defendants were arguably more culpable than the other twelve," there is no record — no submissions whatsoever — that advise as to how the instant defendants are "more culpable" than the other defendants.
As to R.V.'s argument that "it is not unusual for a defendant that heads toward a trial may end up in a better position than those that have previously taken a plea," the People submit that "it is common practice for defendants who promptly accept responsibility to receive credit for that decision, and a better plea bargain, than those that refuse to accept responsibility." While this Court agrees that this practice — providing a low offer in the eve of a case and gradually increasing same in accordance with the additional resources and evidence gathered by the prosecution — may have historically been the manner in which cases were disposed in New York County, it is certainly not the norm for Mr. Bragg's office — at least not in TAP B, the part in which this matter is currently pending. To the contrary, the People's offers in this part are routinely the lowest offers ever presented in a matter and it is often the forum in which the People, years after an indictment, begin the process of screening defendants for programs and non-incarceratory dispositions.
The Court agrees with the arguments submitted by J.O. and R.V. This Court believes that the public will be relieved to know that our judiciary carefully considers the arguments of the parties that come before the court and that the courts will dismiss charges when they constitute an injustice. Accordingly, this factor weighs in favor of dismissal against Defendant J.O. and R.V.
Factor 8 — The Impact of a Dismissal on the Safety or Welfare of the Community
Citing to her arguments made with respect to Factor 7, J.O. argues that dismissing the charges against her would not have a negative impact on the safety or the welfare of the community. 
R.V. similarly argues that dismissal would have little or no effect on the safety and [*11]welfare of the community, including any individuals associated with this case. Rather, R.V. argues that dismissal of the matter would have a positive effect since the community would know that the judicial system "has the discretion to evaluate the complex factors associated with the pandemic era and dismiss cases where no party has been impacted by the confusion and societal upheaval of the pandemic." Citing the unprecedented nature of the pandemic, R.V. urges the Court to consider that the incident which gave rise to this indictment took place during a time of great confusion, "hasty political policy making" and "conflicting noise". R.V. also notes that during the time of the incident, many lawsuits were publicized challenging the City's vaccine mandate for its employees and "workers were hearing conflicting advice."
According to R.V., a dismissal would allow him to grow professionally, support his family and continue to improve his circumstances. While this would personally benefit him, R.V. maintains that this would also be a benefit to the community in the long run. R.V. argues that he served an essential critical function in that he is one of the many "unseen municipal workers who ensure that the people of this city have safe, fresh, clean water." Furthermore, R.V. argues, the People of New York could potentially lose a highly experienced and well trained individual with skills that are not easily replaceable. As R.V. argues that such a result would negatively impact the community, he maintains that this eighth factor weighs in favor of dismissal.
As stated, infra, Counsel for Clifford does not delineate arguments as to each factor, but argues in sum and substance, that Clifford's sales were altruistic and in response to a strong demand from individuals fearful of the vaccine. Much like the arguments made by R.V., Clifford states that during the "controversial time during the Pandemic, the lines that separated right and wrong as they concerned the Vaccine were blurred as whole communities of people were afraid of vaccine and its potentially harmful effects on their loved ones." Clifford states that she believed she was helping people by providing them with vaccination cards and that the people who reached out to her "did not mind paying for the vaccination cards and serial numbers" provided by Barkley because "the real serial numbers from real vaccines would help them return to their lives, schools, jobs, etc." Clifford also generally states that the case should be dismissed against her as she is a productive member of society, a hardworking single mother of two children and her crimes "were born out of a genuine concern for her health, and the health of others."
When addressing the eighth factor, Barkley states that the impact on the safety and welfare of the community would be minimal at best, as this was not a crime of violence. Furthermore, Barkley maintains that the People have not alleged that she possesses any current threat nor reason to believe that she poses any future threat to the safety or welfare of the victims or the community. According to Barkley, "it is her commitment to living responsibly, along with her knowledge of how to do so, which is the greater assurance of community involvement than a criminal conviction." Moreover, Barkley maintains that a felony conviction would have a "grave impact" upon her ability to find employment in the future. 
In opposition, the People maintain that the crimes the Defendants allegedly committed "flouted the vaccination mandates, which were adopted with the goal of protecting the public welfare of the community" and that dismissal would undermine this goal. According to the People, dismissal would disincentivize defendants and others from complying with future directives in the event of another public health emergency in the future. The People further maintain that dismissal would serve to incentivize falsification of government documents and [*12]tampering with government databases. The People state that this factor weighs against dismissal since the government has a compelling interest in ensuring the integrity of its records, particularly when they considering matters of public health.
Based upon the record before the Court, it is clear that the eighth factor weighs in favor of dismissal against J.O. and R.V. As discussed, supra, J.O. purchased the falsified COVID-19 vaccine card in order to continue her education in a nursing program. While this Court does not condone the falsification of medical documents by medical professionals, or those studying to become one, there is no evidence that J.O. actually submitted the COVID-19 vaccine card to anyone or used it to defraud anyone or any entity. The record shows that J.O. did not use the purported falsified vaccine card to achieve any benefit and instead, received the COVID-19 vaccine prior to returning to school. Such a record demonstrates that dismissal would not have any effect on the welfare and safety of the community since J.O. decided to comply with the vaccine mandate. J.O. made this decision prior to the commencement of this action or any threat of consequence from using the COVID-19 vaccine card. Furthermore, in a case where the record shows that the defendant complied with the mandate voluntarily, the Court does not find that dismissal would negatively impact the welfare and safety of the community. Based upon the record before the Court, which the People have failed to refute, the Court finds that this factor weighs in favor of dismissal with respect to J.O.
Turning to R.V., the Court finds that this factor weighs in favor of dismissal. As discussed above, R.V. asserts that he purchased the COVID-19 vaccine card in order to keep his employment. While the Court does not promote individuals violating the law in order to protect their jobs, the Court does recognize that R.V. made such a decision during a time of unprecedented chaos. As with J.O., the record here does not show that R.V. decided to purchase a COVID-19 vaccine card in order to make a profit or further any other criminal activity. The Court must consider this factor within the context of the times, not within a vacuum. As laid out by R.V., the pandemic was a time period in which individuals were losing their ability to make a living and support themselves if they did not comply with the vaccine mandate. As stated, supra, there is no societal or specific harm shown as to R.V. There is nothing submitted to suggest that the safety or welfare of the community will be impaired by a dismissal of the charges against R.V. Accordingly, the Court finds that there is no evidence that dismissal would negatively impact the safety or welfare of the community. 
Turning to Barkley, the Court finds that the eighth factor weighs against dismissal. Unlike J.O. and R.V., the People submitted evidence showing that Barkley entered false information into the NYSIIS database. This activity resulted in extensive DOH resources needing to be invested to try and restore the integrity of the database. Such evidence of an intent to defraud and contaminate the database system supports this Court's finding that dismissal would negatively impact the safety and welfare of the community. 
The Court similarly finds that this factor weighs against Clifford, who allegedly profited tens of thousands of dollars from this unlawful activity. As stated above, Clifford monetized people's fears regarding the COVID-19 vaccine and utilized serial numbers in an attempt to legitimize the falsified COVID-19 vaccine cards. Despite counsel's representation that Clifford merely provided cards to scared citizens, the record shows a level of fraud and criminality that far exceeds this characterization. Based upon this record, the Court finds that this factor weighs against dismissal with respect to Clifford. 
Factor Nine - Where the Court Deems it Appropriate, the Attitude of the Complainant or Victim [*13]with Respect to the Motion
According to J.O., the allegations here constitute "a victimless crime" and there is no complainant. Instead, J.O. states, this event was a "collateral consequence of [a] worldwide pandemic and political policies that ineffectually attempted to curtail the spread of the virus." R.V. similarly states that there is no complainant in this case and "since no card was uttered, used or filed, there are no victims of any fraudulent vaccination card." The Court notes that neither Clifford nor Barkley address this factor.
The People state that while there is no individual victim or complainant "in the traditional sense," the People do not agree with J.O.'s argument that this is a victimless crime. Rather, the People state the DOH expended considerable resources in unraveling the scheme carried out by Clifford and Barkley. Furthermore, the People state, the Defendants' actions put others at risk for their own benefit. Based upon such consideration, the People state that this factor does not weigh in favor of dismissal.
The Court finds that this factor is not relevant because there is not a specific victim or complainant in this case. With respect to the People's positions regarding the DOH and the community at large, the Court has sufficiently addressed such points under other factors. As there is no "victim" in this matter, the Court finds that this factor does not weigh in favor or against dismissal.
Factor Ten — Any Other Relevant Fact Indicating that a Judgment of Conviction Would Serve No Useful Purpose
The papers are bare as to arguments regarding this factor that have not already been discussed under other elements. There are no additional facts, other than those discussed, supra that indicate that a judgment of conviction would serve no useful purpose.

Conclusion
After careful consideration of all the factors discussed, supra, it hereby
ORDERED that the motion by Defendant J.O. is hereby granted; it is further
ORDERED that the indictment is dismissed and sealed as against J.O.; it is further
ORDERED that the motion by Defendant R.V. is hereby granted; it is further
ORDERED that the indictment is dismissed and sealed as against R.V.; it is further
ORDERED that the motion by Defendant Jasmine Clifford is hereby denied in its entirety; and it is
ORDERED that the motion by Defendant Nadayza Barkley is hereby denied in its entirety.
This constitutes the Decision and Order of the Court.
Dated: January 30, 2024
New York, New York
__________________________________
Hon. Brendan T. Lantry
Justice of the Supreme Court

Footnotes

Footnote 1: The actual names of Defendants R.V. and J.O. have been removed, as the indictment as to them has been dismissed and sealed.

Footnote 2: The People aver that they did not "cherry-pick" the sixteen defendants but, instead, "vett[ed] the individuals . . . look[ing] for individuals who [they] felt were in positions where the vaccine mandate, the vaccine cards were particularly relevant." Transcript Page 23, Lines 6-10.

Footnote 3: The People aver that the categories of individuals they were "primarily interested in" were healthcare workers, people in government positions, people who worked with children and people who worked with the elderly. See Transcript at Pages 23-24, Lines 19-1. While the People conceded that they did not know "definitively" the profession of each of the over two hundred buyers, they did not prosecute individuals for whom they did not have evidence fell into one of the categories above.
Footnote 4: Oddly, and inappropriately, the People's papers and oral arguments fixated on an unindicted allegation against R.V. that he obtained a fake doctor's note to claim time off from his work pertaining to symptoms from receiving the COVID-19 vaccine. While R.V.'s conduct, if true, is certainly wrong and deplorable, this decision by the Court will not be clouded by this red herring. Absent criminality, this Court is not in a position to adjudicate whether employees are honest with their employers — and vice versa.

Footnote 5: An additional argument routinely submitted to the Court in support, but not submitted here, is that the defendant has not engaged in any new criminal behavior from the time of the alleged incident to the date of the proposed disposition.